**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Josan Wolf PATINO, Defendant–Appellant.**

No. 88–1681.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1988.

Decided Nov. 10, 1988.

Alan G. Habermehl, Kalal & Habermehl, Madison, Wis., for defendant-appellant.

John Vauderk, Asst. U.S. Atty., Madison, Wis., for plaintiff-appellee.

Before POSNER, FLAUM and MANION, Circuit Judges.

MANION, Circuit Judge.

This case comes before this court for the second time to determine the admissibility of a second confession made by defendant Josan Patino six days after an illegal search of her apartment. After finding the search of Patino's apartment unlawful, this court suppressed Patino's first confession, made on the day of the search, as the fruit of the illegal search, but remanded the case

to the district court for further proceedings regarding Patino's second confession. *United States v. Patino,* 830 F.2d 1413 (7th Cir.1987). Patino appeals the district court's denial of her motion to suppress the second confession. We affirm.

## I.

In August 1986, William Richard became the object of surveillance conducted by the Chicago office of the FBI as a result of information received from the FBI's Plattsburgh, New York office. The Plattsburgh office had received a tip from an inmate who had provided reliable information in the past that Patino and Richard might have committed a series of armed robberies in Illinois and Wisconsin. With the inmate's consent, the Plattsburgh FBI taped a telephone call between the inmate and Patino during which Patino admitted her involvement in the robberies. The Plattsburgh office sent the Chicago office a teletype setting forth the information obtained from the inmate and subsequently sent a tape recording of the telephone conversation.

The teletype revealed among other things, that Patino and Richard had committed several robberies, including the robberies of two banks in Madison, Wisconsin, and that the pair was considered armed and dangerous. The teletype also revealed their involvement in the shooting of a security guard while robbing a Chicago area Happy Foods supermarket, Richard's plans to move in with Patino on August 7, 1986, and the couple's plans for one more bank robbery in the Chicago area.

Special Agent Doorley of the Chicago FBI office learned that a William Richard had been incarcerated in Wisconsin. An FBI agent obtained a photograph of Richard from his prison file and showed it to an officer of the Mutual Savings and Loan Association of Madison. The officer identified Richard as the person who had robbed that institution. At 9:30 a.m. on August 14, 1986, the same photograph was shown to Patino's neighbor in Chicago who identified Richard as a visitor of Patino.

At about 1:00 p.m. on August 14, 1986, several FBI agents entered Patino's apartment to arrest Richard, whom they had previously observed carrying furniture into the building. The agents had no warrant, either to search Patino's apartment or to arrest Patino or Richard, though they did have an oral authorization for Richard's arrest from an assistant United States Attorney in Madison, Wisconsin.

The agents found Patino in her living room. One of the agents pointed his shotgun at her, identified the group as FBI agents, and asked where Richard was. The agent repeated his question after Patino failed to respond; Patino then pointed over her shoulder toward the bedroom door. The agents apprehended Richard in the bedroom. The agents handcuffed Patino and took her to the bathroom to ask for her cooperation out of Richard's presence. She was told they could prove her involvement in four bank robberies and one convenience store robbery. Patino asked to make a deal; the agents declined and again asked whether she would cooperate. After she agreed, Patino and the agents left the bathroom with Patino holding her hands behind her back to conceal from Richard the fact that her handcuffs had been removed.

Two agents remained behind to talk to Patino after Richard was taken away for processing. The agents read Patino her *Miranda* rights and told her that they would leave her apartment if she wished. Patino agreed to talk and provided the agents with a signed statement. The interview was conducted in a cordial and non-threatening atmosphere. Twice during the interview Patino left her apartment, once to look for her dog, and a second time to walk her dog.

The following day, August 15, Patino called one of the agents and reported that Richard's mother had called her and made some vaguely threatening remarks. Patino also volunteered that Richard's gun was stored in his brother's basement. Finally, Patino thanked the agents for having been so nice to her on the previous day.

Shortly afterwards, Agent Doorley informed Detective Barker of the Chicago police that the FBI had identified the persons responsible for the Happy Foods store robbery and that the FBI had obtained a signed statement from Patino admitting her involvement in the robbery. Agent Doorley had previously provided the Chicago police with all of the information at his disposal, including the information contained in the Plattsburgh FBI teletype and the taped telephone conversation between the inmate-informant and Patino. From the record it appears that this information was conveyed to the Chicago police before August 14. Doorley later delivered a copy of Patino's August 14 statement to Barker.

On August 20, 1986, six days after the FBI searched Patino's apartment, the Chicago police called Patino and asked to talk to her at the police station. Two police officers came to Patino's apartment at 3:00 p.m. and drove her to the police station. Once at the station, Patino was interviewed by Assistant State's Attorney Fecarotta. Prior to interviewing Patino, Fecarotta reviewed the police beat report and discussed the case with two Chicago police detectives. The detectives told Fecarotta that Patino was involved with Richard in the attempted armed robbery of the Happy Foods store and in several bank robberies. One of the detectives told Fecarotta that Patino had been the getaway driver for the grocery store robbery.

Before interviewing Patino, Fecarotta informed her that she would be charged with attempted armed robbery. Fecarotta considered Patino to be under arrest, and reviewed a waiver of rights form with her item by item before questioning her. Patino stated that she understood each right and signed the waiver in the presence of Fecarotta and one of the detectives. The district court found that Patino gave her statement to Fecarotta freely and voluntarily. It further found that no threats, promises, or other inducements were made to procure either her confession or the waiver of her right to remain silent.

Patino was indicted by a grand jury on counts of armed robbery. She moved to suppress her two confessions, contending they were the fruits of an unlawful search of her apartment. The district court denied Patino's motion, reasoning that the FBI agents' entry and search of Patino's home was lawful and that the FBI's subsequent interview was lawful as well. Patino later entered a guilty plea to reduced charges on the condition that her motion to suppress the confessions be preserved for appellate review. On appeal, this court reversed as to the August 14 statement, holding the search of Patino's apartment had violated the Fourth Amendment, and that, as a result, the August 14 statement had to be suppressed as the fruit of that unconstitutional search. But the case was remanded to the district court for further proceedings concerning the August 20 statement. *U.S. v. Patino*, 830 F.2d 1413. On remand the district court denied Patino's motion to suppress.

## II.

Patino challenges the admissibility of her second confession on two separate grounds. First, she contends that her August 20 arrest by the Chicago police was unlawful because it was made on the sole basis of unlawfully obtained evidence—her August 14 statement—and that the second confession was the fruit of the arrest. Without her prior statement, Patino argues, the Chicago police lacked probable cause to arrest her, thus making her arrest unlawful. In other words, Patino contends that her arrest was the fruit of her initial confession and that her second confession was the fruit of the arrest. This, the argument goes, bridges the illegal search on August 14 and the August 20 confession, thus making the second confession the fruit of the illegal search.

In advancing this argument Patino overlooks the fact that there was probable cause to arrest her without her first confession. The FBI informed the Chicago police about the contents of the Plattsburgh FBI teletype and the taped telephone conversation between Patino and the inmate-informant, both of which clearly implicated Patino in the bank robberies and in

the grocery store robbery and shooting before her arrest on August 20.[1] Based on this information, the magistrate found that there was probable cause to arrest Patino on August 14 (though she wasn't arrested at that time). Reviewing that determination under a *de novo* standard of review, *United States v. Lima,* 819 F.2d 687, 688 (7th Cir.1987), we agree that this information, apart from the August 14 confession, provided a sufficient independent factual basis to establish probable cause to arrest Patino. *See United States v. Hairston,* 763 F.2d 233, 235 (7th Cir.1985), *cert. denied,* 474 U.S. 854, 106 S.Ct. 158, 88 L.Ed. 2d 131 (1985) (probable cause exists where the facts and circumstances at the time of the arrest and of which the police had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrested person committed or was committing an offense); *United States v. Agostino,* 608 F.2d 1035 (5th Cir. 1979) (where there has been at least minimal communication between police officers, courts look to the officers' collective knowledge in determining the existence of probable cause); 1 W. LaFave, J. Israel, *Criminal Procedure* § 9.4, at 751–52 (1984). The information in the possession of the Chicago Police Department provided by the FBI before the illegal search plainly established probable cause to arrest Patino. Based on that information, the August 20 arrest was entirely lawful and was not tainted by the prior illegal search.

■ We now turn to Patino's second argument in which she seeks to suppress the second confession on the grounds that it is the direct fruit of her first statement,[2]

without regard to her subsequent arrest. We agree with the district court that the government has met its burden by establishing that the second confession was not an undue exploitation of the illegal search of Patino's apartment.

■ The framework for our analysis is set forth in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), where the Court articulated several factors to consider in determining whether the taint of an unlawful search or arrest has sufficiently dissipated so as to no longer taint a subsequently acquired statement. The threshold requirement in the attenuation analysis is the voluntariness of the challenged statement. As *Brown* makes clear, although this is an important factor, it is not dispositive. The remaining factors bearing on admissibility are the "temporal proximity" of the illegal conduct and the confession, the presence of any intervening circumstances, "and, particularly, the purpose and flagrancy of the official misconduct." 422 U.S. at 603–04, 95 S.Ct. at 2261–62. As an initial matter, we are satisfied that the second statement was sufficiently voluntary in that it was preceded by Patino's signing a waiver of rights form and because, as the district court found, no threats, promises or other inducements were made to procure the waiver. Patino thus participated willingly and with full understanding of the circumstances.

Turning to the temporal proximity between the initial illegality and the second confession, we agree with the district court that the time here between the search and the second confession, coupled with the be-

---

1. Although the district court concluded Patino had been arrested on August 20, the record is not entirely clear on this issue. What is known is that the Chicago police called Patino on August 20 and asked to talk to her at the police station and arranged for two police officers to drive her to the police department. Once at the station, Assistant State's Attorney Fecarotta considered her to be under arrest, informed her that she was going to be charged with armed robbery and reviewed a waiver of rights form with her which she acknowledged understanding and signed. Whether this constituted an arrest or not is unimportant, however, since the Chicago police plainly had probable cause to arrest Patino on August 20 on the basis of the

information it had independent of her August 14 confession.

2. Patino at times argues that the second confession was tainted by the illegal search and at other times that it was tainted by the initial confession. As will be shown, however, the second confession was not tainted by the search or the initial confession. Substantial time (six days) elapsed between the first and second confessions and there was no police misconduct. Further, other intervening circumstances offset any negative impact of the initial search and confession.

nign circumstances during the interim period, insulates the second confession from any taint. Patino's second confession on August 20 came six days after the illegal search and her initial confession. During that period she was neither under arrest nor in custody and remained free to move about and contact counsel or friends about her predicament (though apparently she chose not to consult anyone). The day following the FBI's search, Patino, on her own, contacted the FBI and reported that Richard's mother had made some vaguely threatening remarks, informed the FBI that Richard kept a gun in his brother's basement, and thanked the agents for having been so kind to her the previous day.

■ This differs markedly from the circumstances in *Brown, supra.* There the illegal arrest and Brown's confession were separated by a mere two hours.[3] Likewise, in *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), only six hours passed between the arrest and the challenged confession. Although the interim between the illegality and the confession in *Taylor* was longer than that in *Brown, supra,* the Court declined to find any significance in that difference, explaining that the petitioner had remained in police custody and was unrepresented by counsel, questioned on several occasions, fingerprinted and subjected to a lineup. In sharp contrast to those circumstances, Patino was free during the entire period between the search and her second confession and was not questioned or contacted by the police—though she chose to contact the FBI on her own (and even thanked them for their consideration).

The passage of six days coupled with Patino's complete freedom to move about and to contact counsel if she so desired is nearly enough to establish that Patino's second confession was " 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.' " *U.S. v. Patino,* 830 F.2d at 1419 (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)). *See also United States v. One 1979 Mercury Cougar,* 666 F.2d 228, 230 (5th Cir.1982). Patino, though, argues that the lengthy passage of time cannot be viewed by itself and that the fact that she had already provided a confession—thus letting the "cat out of the bag"—destroyed any salutary effect that the passage of time may otherwise have had. In other words, Patino seeks to use her prior confession to insulate her from her second confession.

An unlawfully obtained first confession does not forever preclude a confessor from making a usable confession under lawful circumstances. *Oregon v. Elstad,* 470 U.S. 298, 312, 105 S.Ct. 1285, 1294, 84 L.Ed.2d 222 (1985) (upheld the admissibility of a lawfully obtained second confession which had been given after a previous confession had been made without the obligatory *Miranda* warnings). Such is the case here. Even under a broader application of the "fruits" doctrine, *id.,* there was a sufficient break in events here so that Patino's second confession was not tainted by her first confession. One simply cannot disregard the six-day period between the two confessions, nor can one ignore the salutary effect of Patino's complete freedom during that lengthy period, as Patino urges. Furthermore, it must be remembered that the Chicago police and the FBI had substantial information, apart from Patino's first confession, establishing her involvement in several robberies and that Patino had been told by the FBI, before her first confession, that her involvement in the robberies could be proved. Patino also had actively assist-

---

3. This is not to say that a short period of time is dispositive on the question of taint. *See Dunaway v. New York,* 442 U.S. 200, 220, 99 S.Ct. 2248, 2261, 60 L.Ed.2d 824 (1979) (Stevens, J., concurring) (if "there are no relevant intervening circumstances, a prolonged detention may be a more serious exploitation of an illegal arrest than a short one." Conversely, "even an immediate confession may have been motivated by a pre-arrest event...."); *United States v.* *Edmondson,* 791 F.2d 1512, 1515–16 (11th Cir. 1986) (time between the unlawful arrest and the admissible confession was approximately forty-five minutes); *United States v. Milian–Rodriguez,* 759 F.2d 1558, 1565 (11th Cir.1985), *cert. denied,* 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 112 (1985) (one hour between the arrest and the time of the challenged statements sufficient time to purge taint).

ed the FBI in its investigation by informing the agents of the whereabouts of Richard's gun. Thus, although Patino argues that her second confession was in effect compelled by her having already confessed once, we believe it is equally plausible—indeed more so—that Patino confessed a second time because she was cooperating in the investigation and because she previously had been told that her involvement in the robberies could be proved without the confession.

Continuing with the attenuation analysis, we look to any intervening events between the initial illegality and the second confession. Two significant events occurred between the search of Patino's apartment and her second confession six days later. First, on the day following the search Patino tipped the FBI off about the whereabouts of Richard's gun. At this point Patino was acting not from compulsion, but in the spirit of self-interest and cooperation. Second, she was lawfully arrested on August 20 and executed a written waiver of rights form on that day. These intervening events diminish, if not completely eliminate, any lingering taint from the illegal search.

The final factor for consideration is the "purpose and flagrancy" of the FBI's illegal search conducted on August 14. *Brown, supra.* Patino argues that this issue was conclusively decided by this court in her prior appeal; however, that reliance is misplaced. Although we previously noted that the entry was not peaceful, that Patino was greeted with a shotgun and that the agents should have obtained a warrant before entering Patino's apartment, *U.S. v. Patino,* 830 F.2d at 1416–18, once the FBI removed Richard, the atmosphere changed. Whatever impact the search may have had on Patino's first confession, it had none on the second. Six days intervened between the search and the second confession, during which time Patino had complete freedom. The previously discussed intervening events between

the search and the second confession further mitigated the impact of the unlawful search. Moreover, the FBI's show of force in the search was limited to the initial entry into Patino's home. Once Patino was separated from Richard and he was removed, the interview was conducted in a cordial and non-threatening atmosphere. Further, that the agents initially used the shotgun is perfectly understandable in light of the information they had which warned that Patino and Richard were armed and dangerous.[4]

The search of Patino's apartment plainly was not a mere evidence expedition. The FBI had reason to believe both Patino and Richard were in the apartment and, importantly, the FBI knew before entering, that both had participated in several robberies, were planning another robbery, and were to be considered armed and dangerous. Under these circumstances, the search was not so flagrant or abusive as to taint the second confession made six days later. We also note that the Chicago police acted properly in this matter. They had sufficient information to arrest Patino (even apart from her confession). They properly advised Patino of her rights, and had no knowledge that the earlier search of Patino's apartment had been unlawful.

We affirm the district court's denial of Patino's motion to suppress.

AFFIRMED.

---

4. This also dispels Patino's contention that the manner of the search was calculated to cause surprise, fright and confusion. *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262; *United States v. San-* *chez–Jaramillo,* 637 F.2d 1094, 1100 (7th Cir. 1980), *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980).