**UNITED STATES of America, Plaintiff,**

v.

**47 WEST 644 ROUTE 38, MAPLE PARK, ILLINOIS, et al., Defendants.**

No. 92 C 7906.

United States District Court, N.D. Illinois.

April 25, 1997.

Ernest Y. Ling, Assistant U.S. Attorney, Chicago, IL, for Plaintiff.

Stephen M. Komie, Komie & Associates, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This 21 U.S.C. §§ 881(a)(6) and 881(a)(7)[1] action seeks the forfeiture of 3,828 gold and silver coins ("Coins"), $1,336 in United States currency ("Funds") and real property at 47 West 633, Route 38, Maple Park, Illinois ("Property"). Each of Greg Accardi ("Greg") and Holly Accardi ("Holly")—collectively "Accardis"—has filed an individual claim of ownership of all of that property and contests such forfeiture.

Now the United States has moved for summary judgment pursuant to Fed.R.Civ.P. ("Rule") 56. Both sides have complied (at least nominally) with this District Court's

---

1. Further citations to Title 21 provisions will simply take the form "Section—."

General Rule ("GR") 12(M) and 12(N),[2] and the United States' motion is fully briefed and ready for decision. For the reasons stated in this opinion, the motion is granted in part and denied in part.

### Summary Judgment Standard

Under familiar Rule 56 principles, a party seeking summary judgment bears the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). This Court is called upon to draw inferences in the light most favorable to the non-moving party, but it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991)).

What follows in the *Background* section is a factual statement drawn from the parties' submissions, with any differences between them resolved in Accardis' favor. Facts that fit better into the substantive legal discussion will be set out later in this opinion.

### Background

On the morning of September 13, 1992 Illinois State Police Sergeant James Griffith ("Griffith") flew over the Property and saw what he said "appeared to be several cannabis plants behind the residence" (U.S.12(M) ¶¶ 1–2; A. 12(N) Ex. A at 7).[3] He was flying at approximately 90 miles per hour at an altitude of approximately 1,000 feet (A.12(N) Ex. A at 7–8). Griffith photographed the Property's area in question and showed the

developed photographs to the Illinois State Police Task Force (A.12(N) Supp. ¶ 4; A. 12(N) Ex. B). Police analysis of the photographs revealed what "appeared to be several potted marijuana plants growing behind a pole barn located on the defendant property" (U.S.12(M) ¶ 7).

On September 15, 1992, without obtaining either a search warrant or an arrest warrant, about five Illinois State Police Task Force officers approached the Property (A.Supp.12(N) ¶¶ 6–7). William Powell ("Powell"), the officer in charge of the investigation, stated that they intended "to get a consent search to search that property" (A.12(N) Ex. C at 78). Whether the police legitimately obtained that consent is disputed by the parties. For purposes of this Rule 56 motion, however, this Court must credit the nonmovants' version of the facts: that the police fraudulently told Greg that they had a search warrant (A.12(N) Ex. H at 36, 38), that Greg did not give consent for the search (*id.* at 47) and that his signature on the consent form is a forgery (A.12(N) Exs. E at 6, F, G).

During their complete search of the premises on September 15 the police found a variety of items: 45 marijuana plants, 500 grams (about 17.6 ounces) of dried marijuana, 22 firearms with ammunition, $1336. in United States currency, some 3,828 gold and silver coins, electric drying fans, plant food, an Ohaus scale, two large electric grow lights and marijuana seeds (U.S.12(M) ¶¶ 12–13). Greg was then arrested and charged with felony possession of marijuana,[4] and Holly

---

**2.** GR 12(M) and (N) were designed to facilitate summary judgment motions by flushing out any factual disputes. Unfortunately Accardis' GR 12(N) statement does not follow that GR requirement that the nonmovant respond to "each numbered paragraph in the moving party's statement"—instead Accardis simply recite their own version of the facts. Under strict adherence to GR 12(N) that irregularity could be treated as Accardis' admission of all of the United States' GR 12(M) statements. But because this Court has discretion to determine what constitutes compliance with GR 12(N) (*McGann v. Northeast Ill. Reg'l Commuter R.R.,* 8 F.3d 1174, 1178 n. 3 (7th Cir.1993)), Accardis will be deemed to have admitted only those statements that they have not controverted (with factual support) in their GR 12(N) response.

**3.** GR 12(M) statements by the government will be cited "U.S. 12(M) ¶—" and Accardis' additionally numbered GR 12(N) statements will be cited "A. 12(N) Supp. 1—." Unless otherwise noted, the cited statements have been either explicitly or implicitly admitted in the corresponding response. Those same "U.S." and "A." abbreviations will be employed for the parties' other filings.

**4.** Greg was also charged with a violation of Illinois state gun laws (U.S.12(M) ¶ 15), but it seems likely that the charge did not proceed to trial because there is no mention of it either in the Illinois Appellate Court's opinion (*People v. Accardi,* 284 Ill.App.3d 31, 32, 219 Ill.Dec. 459, 460–61, 671 N.E.2d 373, 373–74 (2d Dist.1996))

was later charged with misdemeanor possession of marijuana (U.S.12(M) ¶¶ 14–16). At trial in the state Circuit Court, Accardis moved to quash the arrest and suppress all the evidence seized during the September 15 search and seizure, which they argued violated their Fourth Amendment rights (U.S.12(M) ¶ 19). That motion was denied based on the open fields doctrine of *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (to which denial the Accardis preserved an objection). After a stipulated bench trial both Accardis were convicted (U.S.12(M) ¶¶ 20–21).

Accardis appealed their convictions on the grounds that their motion to suppress should have been granted. Finding that the Circuit Court's reliance on *Riley* was misplaced, the Illinois Appellate Court (see n. 4 for the citation to its opinion) reversed the convictions and remanded the case to the Circuit Court for a finding of whether the warrantless search and seizure had violated Accardis' Fourth Amendment rights. On remand the Circuit Court granted Accardis' motion to quash the arrest and to suppress evidence, based on a finding that the search "was an unconstitutional and warrantless intrusion onto the Accardi property" (*People v. Accardi*, Nos. 92 CF 1570, 92 CF 1838 (Ill.Cir.Ct., 16th Cir., Mar. 14, 1997)).

To return to this action, on December 3, 1992 the United States filed its verified Complaint seeking forfeiture of the assets identified in the properties (U.S.12(M) ¶ 17). Greg and Holly, (and another couple, the Stouts, whose claims are not implicated in the current motion) filed timely verified claims to the assets (*id.* ¶ 18). This Court granted several stays of this action during the pendency of the state court criminal proceedings, but the parties have now participated in discovery that serves as part of the predicate for the United States' Rule 56 motion and Accardis' response.

### Standing Issues

■ Two types of standing are relevant in a civil forfeiture action: Article III standing

and statutory standing (*United States v. $103,387.27*, 863 F.2d 555, 560 n. 10 (7th Cir.1988) (citations omitted)):

> To contest a forfeiture, a claimant first must demonstrate a sufficient interest in the property to give him Article III standing, otherwise there is no "case or controversy." With respect to statutory standing, once the procedural rules of [Fed. R.Civ.P., Supp. Rule C(6)] are met, a claimant has standing to defend the forfeiture.

Now at issue is whether either Accardi has Article III standing as to some of the property under consideration. As the United States says, by definition that is a threshold matter, for "unless [claimants] have Article III standing, federal courts lack jurisdiction to consider their claims, including their claim that the government did not have the requisite probable cause to seize the defendant property" (*United States v. $38,000*, 816 F.2d 1538, 1543 (11th Cir.1987) (footnotes omitted)).

■ To establish Article III standing, Accardis bear the burden of establishing "a legally cognizable interest in the property that will be injured if the property is forfeited to the government" (*id.* at 1543 n. 12). It is not necessary that a claimant's interest be one of ownership, for possession may suffice to establish standing (*United States v. Contents of Accounts Nos. 3034504504 and 144–07143*, 971 F.2d 974, 985 (3d Cir.1992)):

> Courts generally do not deny standing to a claimant who is either the colorable owner of the *res* or who has any colorable possessory interest in it.... An owner or possessor of property that has been seized necessarily suffers an injury that can be redressed, at least in part, by return of the seized property.

But "a naked claim of possession ... is not enough" (*Mercado v. United States Customs Serv.*, 873 F.2d 641, 645 (2d Cir.1989)). Instead (*id.*):

> There must be some indication that the claimant is in fact a possessor, not a sim-

---

or in Accardis' responses to interrogatories about their criminal histories (Holly Dep. Ex. 4 ¶ 2; Greg Dep. Ex. 4 ¶ 2).

ple, perhaps unknowing custodian, some indicia of reliability or substance to reduce the likelihood of a false or frivolous claim.

*Greg's Standing as to the Coins*

■ U.S. Mem. 3 challenges Greg's Article III standing to claim the Coins. At his Dep. 15 Greg disclaimed any direct interest in that property, stating "I am not the owner of the coins" and "I believe they belong to Steve and Sue [Stout] and Holly." Both Holly and her brother Steve Stout ("Steve") concur that Greg was not the Coins' owner (Holly Dep. 14–15, Steve Dep. 16). Greg instead characterized his claim on the Coins as "through marital" (Greg Dep. 17), and A. Mem. 2 cites to the Illinois Marriage and Dissolution of Marriage Act (the "Act," 750 ILCS § 5/503(c)(1)) for that proposition.' But the Act does not save Greg's claim because, as explained in *Kujawinski v. Kujawinski*, 71 Ill.2d 563, 573, 17 Ill.Dec. 801, 805, 376 N.E.2d 1382, 1386 (1978):

> The Act does not purport to affect property interests during the marriage. The term "marital property" is a nomenclature devised to realize an equitable distribution of property upon termination of the marriage. Operation of the term "marital property" under the Act is not triggered until the time of dissolution.

By his own admission, then, Greg does not have any ownership or possessory interest that would suffice for him to lay claim to the Coins. Accordingly the United States is entitled to a judgment as a matter of law on that standing issue, and Greg's claim to the Coins is dismissed.

*Holly's Standing as to the Funds*

■ In addition the United States challenges Holly's standing to claim the Funds. Holly Dep. 15 said that she based her claim to the Funds on the fact that they were taken from her property, but she also admitted that the money was not hers and that she did not know to whom it belonged. Merely claiming an ownership interest in premises from which property is seized is not sufficient to establish standing in civil forfeiture actions (*United States v. $501,958*, 633 F.Supp. 1300, 1301–02 (N.D.Ill.1986) and cases cited there). Accardis' argument that Holly may claim the Funds as marital property under the Act fails for the same reason that Greg struck out as to the Coins. As a matter of law Holly has not shown the requisite standing to claim the Funds, and her claim to them is dismissed.

*Fourth Amendment Claim*

■ To succeed on the current motion the United States bears the initial burden of showing that it has probable cause to believe that the property at issue is subject to forfeiture (*United States v. All Assets & Equipment of West Side Bldg. Corp.*, 58 F.3d 1181, 1188 (7th Cir.1995)). That opinion (*id.*, quoting *United States v. $94,000*, 2 F.3d 778, 782–83 (7th Cir.1993), with other citations and footnotes omitted) has described the burden in these terms:

> To show probable cause the government must demonstrate that it has "reasonable ground for the belief of guilt supported by less than *prima facie* proof but more than mere suspicion." In this showing, the government may rely not only on direct evidence but also on circumstantial evidence and on hearsay evidence.[5] Probable cause for the forfeiture exists if the government demonstrates a nexus between the seized property and illegal narcotics activity.

At the summary judgment stage on the ultimate issue of forfeiture, probable cause for that result (not probable cause for the original seizure of property) is determined as of the time of the ultimate forfeiture determination (that is, right now), not as of the time of seizure (*United States v. Two Parcels of Real Property*, 92 F.3d 1123, 1127–28 (11th Cir. 1996) (per curiam) and cases cited there).

■ But before this Court turns to the question of whether there is indeed such probable cause to warrant forfeiture, it must undertake a preliminary inquiry as to wheth-

**5.** [Footnote by this Court] Accardis mistakenly rely on a misreading of the statute when they suggest (A.Mem.5–7) that hearsay evidence is not admissible to show probable cause. *All Assets* clearly teaches that such evidence may indeed be considered to find probable cause in a forfeiture action.

er there is a material issue of fact about the legality under the Fourth Amendment of the September 15 search and of the seizure of the Property. As established in *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 702, 85 S.Ct. 1246, 1251–52, 14 L.Ed.2d 170 (1965), when evidence is seized in violation of a claimant's Fourth Amendment rights "the exclusionary rule is applicable to forfeiture proceedings." Thus illegally seized evidence would be excluded in this probable cause determination, just as would any other evidence that is "a fruit of the poisonous tree" (*Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939)).

▮ As an initial matter, Accardis have raised an issue of fact about whether the marijuana was growing within the area of curtilage linked to their home. As reflected in *California v. Ciraolo*, 476 U.S. 207, 212–13, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986), curtilage is afforded the same protection as the home itself:

> The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.

Here the police aerial photographs reveal that Accardis' house was closely surrounded by a cluster of buildings (A.12(N) Ex. B) and that the marijuana was growing in and around one of those buildings (U.S.12(M) ¶¶ 7, 13). For purposes of this Rule 56 motion, then, it will be assumed that the marijuana and other evidence seized on September 15 was located within the curtilage and therefore should have been afforded the same treatment as if it were actually located in Accardis' residence.

▮ It is well settled that the police flyover of the Property was not an improper search in violation of the Fourth Amendment. Property owners do not have a reasonable expectation of privacy in curtilage areas that are visible to the naked eye from public vantage points, including navigable airspace—the "public airways" (*Riley*, 488 U.S. at 450, 109 S.Ct. at 696–97; *Ciraolo*, 476

U.S. at 213, 106 S.Ct. at 1812–13). And Accardis have not raised any of the concerns articulated in *Riley*, 488 U.S. at 451–52, 109 S.Ct. at 697 about police who fly contrary to regulations or about interference with Accardis' use of their property. Indeed, the 1000–foot altitude flight by a fixed-wing aircraft in this case paralleled exactly the circumstances in *Ciraolo*, so that this case does not involve the added complexities of very low level helicopter flights that were dealt with in *Riley*.

▮ *Riley* and *Ciraolo* do not of course mean that evidence discovered in the September 13 flyover is automatically subject to seizure, because in each of those cases the evidence seen in the flyover was used to establish probable cause to obtain a search warrant (*Riley*, 488 U.S. at 448–49, 109 S.Ct. at 695–96; *Ciraolo*, 476 U.S. at 209, 106 S.Ct. at 1810–11)—a step that the police did not take here. Absent exigent circumstances, police may not search a person's home or curtilage without a search warrant (*McDonald v. United States*, 335 U.S. 451, 455–56, 69 S.Ct. 191, 193–94, 93 L.Ed. 153 (1948)). As taught as long ago as *Agnello v. United States*, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925):

> Belief, however well founded, that an article sought is concealed in a dwelling house furnished no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.

Here the United States has not identified any exigent circumstances present at the time of the September 15 entry on the Property to justify a warrantless search and seizure, relying instead on the claim that Greg consented to the search (U.S.Mem.11). But there is a clear question of fact about the legitimacy of Greg's signature on the consent form, as evidenced by the testimony of a police handwriting analyst who concluded that the signature on the form was a forgery (A.12(N) Ex. H at 47) and by Greg's testimony that the police lied to him about possessing a search warrant (*id.* at 36, 38).

▮ Viewing those facts in the light most favorable to Accardis, a reasonable factfinder

could conclude that the evidence was seized from the Property in violation of Accardis' Fourth Amendment rights. And it is certainly worth noting in that respect that an Illinois Circuit Court has recently addressed the selfsame question on the remand of Accardis' criminal convictions and has determined that the search of Accardis' property was unconstitutional. To be sure, this Court is not bound in issue preclusion terms by that finding,[6] but the result certainly buttresses the conclusion that a reasonable trier of fact could conclude that the September 15 search and seizure violated the Fourth Amendment.

*Scope of Suppression*

In the absence of briefing by either party on the scope of evidence to be suppressed if this Court were to find a Fourth Amendment violation (see U.S. Mem. 11–12, A. Mem. 7–11), this opinion will not define the exact extent of any potential suppression. Instead it must address a slightly different question: If a Fourth Amendment violation were assumed to have occurred,[7] what evidence (if any) exists to show probable cause for any forfeiture that would not be excluded *as a matter of law?*

As the seminal decision in *Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963) teaches:

> The exclusionary prohibition extends as well to the indirect as the direct products of such invasions.

> \* \* \* \* \* \*

Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion.

*Wong Sun, id.* at 485, 83 S.Ct. at 416 quotes *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920) as "express[ing] succinctly" the policy behind that rule:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course that does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

Under that principle it is clear that all the physical evidence seized from Accardis' residence on September 15 (and all police testimony about that evidence) would be suppressed as the direct product of the assumed illegal search. Just as clearly, testimony about the September 13 flyover and the resulting photographs would *not* be subject to exclusion because that evidence was gained independently before any arguably tainted search and seizure. Neither of those clear examples, however, directly controls evidence that is critical here: statements made by Greg before and during his criminal trial and by both Accardis during the discovery process in this action.

> [T]his Court has already ruled that no evidence concerning the search and seizure of the Accardi farm will be admissible or considered in this motion for summary judgment.

Accardis do not specify a date for that alleged ruling, and even apart from this Court's independent recollection, neither the court file nor the electronic docketing system reflects any order along those lines as having been entered. Because that statement was in error, it should be emphasized that the assumption here that evidence would be suppressed is only that—an assumption.

---

6. State criminal court evidentiary determinations do not control in later federal court proceedings because there is no privity of parties, given the fact that two different sovereigns are involved (*United States v. Lauchli*, 724 F.2d 1279, 1282 (7th Cir.1984), citing *United States v. Panebianco*, 543 F.2d 447, 456 (2d Cir.1976)). And as *Panebianco, id.* teaches:

> [C]ollateral estoppel never bars the United States from using evidence previously suppressed in a state proceeding in which the United States was not a party.

7. This Court knows of no determination or even dictum that it has voiced to that effect—yet A. Mem. 7 mysteriously says:

■ To determine whether such statements by Accardis would or would not be subject to suppression, the finder of fact must determine "whether the taint of an unlawful search or arrest has sufficiently dissipated so as to no longer taint a subsequently acquired statement" (*United States v. Patino*, 862 F.2d 128, 132 (7th Cir.1988)). 5 Wayne LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* ("LaFave") § 11.4(c), at 272 (3d ed.1996) (quoting *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417, other footnotes omitted) puts it in these terms:

> In the typical case in which the defendant was present when incriminating evidence was found in an illegal search or in which the defendant was confronted by the police with incriminating evidence they had illegally seized, it is apparent that there has been an "exploitation of that illegality" when the police subsequently question the defendant about that evidence or the crime to which it relates.

*United States v. Nafzger*, 965 F.2d 213, 217 (7th Cir.1992) (per curiam) is an example of such a direct link where a defendant admitted to police, immediately after police had conducted an illegal search and discovered a truck in his shed, that he knew the truck was a stolen vehicle. *Nafzger, id.* (citation omitted) held:

> The court also should have suppressed Nafzger's statements to the officers because it is clear that the evidence turned up by the illegal search—the truck—triggered Nafzger's subsequent admission that he knew the truck was stolen. The admissions were a direct result of the illegal search.

But when the connection is more attenuated than that, our Court of Appeals applies the factors used in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) to determine when an illegal arrest taints later statements (*United States v. Fazio*, 914 F.2d 950, 957 (7th Cir.1990); *Patino*, 862 F.2d at 132).[8] *Patino, id.* (citation to *Brown* omitted) summarizes those factors:

> The threshold requirement in the attenuation analysis is the voluntariness of the challenged statement. As Brown makes clear, although this is an important factor, it is not dispositive. The remaining factors bearing on admissibility are the "temporal proximity" of the illegal conduct and the confession, the presence of any intervening circumstances, "and, particularly, the purpose and flagrancy of the official misconduct."

Here that line of analysis must be applied to a number of statements made by Accardis:[9]

1. Greg's signed statement made at the police station on September 15, a few hours after the police had searched the Property and arrested him (U.S.Ex. A);

2. Greg's testimony at his criminal trial that when the marijuana was discovered during the September 15 search, he admitted that the plants were his in exchange for the police agreeing to refrain from involving Greg's wife and son (A.12(N) Ex. H at 43–44);

3. interrogatory responses by Greg and Holly that the marijuana plants were growing on their property for Greg's personal use (Holly Dep. Ex. 4 ¶ 17; Greg Dep. Ex. 4 ¶ 17), and their deposition testimony regarding those answers (Holly Dep. 25–26; Greg Dep. 20–23);

4. Holly's deposition testimony that both she and Greg had used marijuana on the property (Holly Dep. 27–30) and that she was divorcing Greg because of his drug problems (*id.* 6–10); and

5. deposition testimony and interrogatory answers by each of Greg and Holly as

8. *Patino* and *Fazio* represent a minority position in the application of the *Brown* factors to a statement following an illegal *search* as well as after an illegal *arrest* (see 5 LaFave § 11.4(c), at 272–73). Of course this Court follows the lead set by our Court of Appeals.

9. It may be noted parenthetically that all of Accardis' statements were made voluntarily. Nei-

ther sought to exercise his or her Fifth Amendment rights at any time—though the principal reason that this case has become so ripe on the vine (a bad pun?) is that this Court had stayed all proceedings while Accardis' state criminal charges were still unresolved, thus sparing Accardis a possible Hobson's choice.

to the origin of the Coins seized on September 15 (Holly Dep. 13–18; Greg Dep.15–18) and as to the origin of the Funds (Holly Dep. 19; Holly Dep. Ex. 4 ¶ 5; Greg Dep. Ex. 4 ¶ 5). This opinion will address each of those statements in turn.

■ Greg's signed statement to the police on the day of the search and arrest could be found by a reasonable factfinder to be tainted under either the *Nafzger* "direct result" test or the *Brown* factors. As in *Nafzger*, the statement was made soon after the time of the search, where Greg had been present when the police uncovered the evidence about which Greg made incriminating statements. And under the *Brown* approach, although the voluntary nature of the statement may not be in question, the statement was made temporally close to the time of the illegal search and there were apparently no intervening factors such as a lawyer present (U.S. Ex. A; A. 12(N) Ex. H at 47–52). Finally, the police conduct may be found by a factfinder to have been "flagrant," because there are factual issues about whether the police misrepresented to Greg that they had a search warrant when they encountered him in his home on September 15 (A.12(N) Ex. H at 36, 38). Thus Greg's signed statement may not be considered for purposes of this motion.

Similarly, Greg's testimony about his statements to the police during their search of his property also could be considered tainted under either analysis. As with the signed statement, those oral statements were a direct result of the police discovering the potentially suppressed evidence. And under the *Brown* factors, not only is the temporal gap considerably shorter than that of the later signed statement but the voluntary nature of the earlier oral statement is also in question in light of Greg's testimony that the officer threatened to involve his family (*id.* 43–44). Accordingly that statement will also not be considered in determining probable cause for summary judgment purposes.

■ Accardis' interrogatory responses and deposition testimony about Greg growing marijuana for personal use call for a different result. It is true that as in *Nafzger* the

United States' questions about the amount of marijuana found were directly triggered by the presumed illegally obtained evidence (Holly Dep. Ex. 3 ¶ 17; Greg Dep. Ex 3 ¶ 17). But on the other hand, most of the *Brown* factors are not present: (1) no record facts indicate that the statements were not voluntary; (2) nearly four years had passed between the possible illegal search and the interrogatory responses; and (3) an intervening factor was present in that the Accardis were represented by a lawyer, who actually signed the interrogatory responses on Accardis' behalf (Holly Dep. Ex. 4 ¶ 17; Greg Dep. Ex. 4 ¶ 17). Even though the long-past flagrancy of the police conduct might still weigh in the scales a bit, on balance the congeries of *Brown* factors compels the conclusion that those statements by Accardis are sufficiently attenuated to purge the taint. This Court is constrained, under *Patino* and *Fazio*, to find that as a matter of law those statements would not be suppressed and may properly be considered for this motion.

■ Next, Holly's deposition testimony about Accardis' personal use of drugs, given in response to inquiries other than those that invoked the questionable evidence, will also be considered on the current motion. In addition to the same dearth of *Brown* factors linking those deposition statements directly to the September 15 seizure, the United States can look to an independent source for asking about Accardis' drug use—the September 13 flyover and photographs.

Finally, Accardis' interrogatory responses and deposition testimony with respect to the Coins and Funds present the same issue as their responses about the growth of marijuana for personal use—the United States' questions were directly triggered by the presumed tainted evidence, yet virtually none of the adverse *Brown* factors are present. And so for the same reasons as discussed earlier, Accardis' statements as to those seized items will also be considered on this motion.

### Probable Cause

■ This opinion has earlier identified the applicable probable cause standard and the nature of the burden that it imposes on

the United States in the first instance. Once the government has met that threshold burden, the claimant then has the ultimate burden to prove by a preponderance of the evidence that the property is not subject to forfeiture by showing that the property was not used in connection with drug activities (*All Assets*, 58 F.3d at 1189). Furthermore (*id.*):

> If the claimant-fails to rebut the government's proof, that showing of probable cause alone will support a judgment of forfeiture.

This opinion will address the parties' relative burdens, first as to the forfeiture of the Property and then as to the forfeiture of the Coins and the Funds.

*Property Forfeiture*

■ United States seeks forfeiture of the Property under Section 881(a)(7), which subjects to such forfeiture any real property "which is used or intended to be used" to commit "a violation of this subchapter punishable by more than one year's imprisonment."[10] Included in the list of violations subject to more than one year's imprisonment is the "manufacture" of a controlled substance (Section 841(a))—and despite the oddity of such an interpretation in terms of normal usage, the cultivation of marijuana constitutes "manufacturing" in violation of that section (see the Section 802(15)) defini-

tion of "manufacture" and the Section 802(22) definition of "production" as including the "planting, cultivation, growing, or harvesting or a controlled substance." Thus *United States v. One Parcel of Real Property*, 960 F.2d 200, 205 (1st Cir.1992) has squarely rejected the contention advanced by Accardis to challenge forfeiture of the Property on that basis.[11]

■ Several properly admissible factors establish probable cause to believe that the Property was used to grow marijuana. There is Griffith's testimony that he saw what "appeared to be several cannabis plants" growing on the Property during the September 13 flyover (A.12(N) Ex. A at 7), confirmed by the photographs that he took (A.12(N) Ex. B).[12] There are also Accardis' admissions that Greg was growing the plants for his personal use (Holly Dep. Ex. 4 ¶17; Greg Dep. Ex. 4 ¶17). And there is Holly's testimony that Greg had a drug problem and that she had seen him smoking marijuana on the property (Holly Dep. 6–10, 27–30). In combination, those factors amply establish probable cause that the Property is subject to forfeiture, and Accardis have not raised anything to create a factual issue as to whether the Property was being used to grow marijuana. Accordingly the United States' motion for summary judgment regarding the Property is granted.[13]

10. Both Section 881(a)(6) and Section 881(a)(7) contain exceptions for situations where the owner establishes that the act or omission was "committed or omitted without the knowledge or consent of that owner." Accardis have not sought to raise that "innocent owner" defense.

11. Accardis mistakenly base their objection to the United States' probable cause showing on the false premise that Section 881(a)(7) requires that the property be used for narcotics *trafficking* and is not triggered by merely growing a controlled substance for personal use (A.Mem.9–11). But Congress is free to enact a different and broader vocabulary, and it has done so here.

12. U.S. R. Mem. 7–8 suggests than issue preclusion mandates a finding here that the photographs alone sufficiently establish probable cause because the Illinois Appellate Court "implicitly recognized" that the photographs indicated that marijuana was growing on the Property. But issue preclusion does not operate when that issue was not necessary to support the judgment in the first action (18 Charles Alan Wright, Ar-

thur Miller & Edward Cooper, *Federal Practice and Procedure: Jurisdiction* § 4421, at 192 & n. 1 (1981)). In this instance it was unnecessary to assess the sufficiency of the photographs at the Illinois Appellate Court level, because even if probable cause *was* established the later warrantless search of the curtilage was still potentially illegal. Thus this opinion considers the photographs as suggestive, but not conclusive, of marijuana growth. And that combined with Accardis' admissions unquestionably equates to probable cause here.

13. Nothing has been developed in the record before this Court to enable any comparison between the amount of marijuana found on the Property and the value of the Property—the kind of comparison that could conceivably present a proportionality question under the Eighth Amendment's Excessive Fines Clause, which has been held applicable to civil forfeiture actions in *Austin v. United States*, 509 U.S. 602, 622, 113 S.Ct. 2801, 2812, 125 L.Ed.2d 488 (1993). In any event, Accardis have not raised that defense,

### Coins and Funds Forfeiture

█ As for the potential forfeiture of the Coins and Funds, the United States looks to Section 881(a)(6), which targets money or "other things of value" furnished or intended to be furnished for illicit drug trafficking or "proceeds traceable to such an exchange." Accardis have successfully raised issues of fact to stave off summary judgment for both items.

With respect to the Coins, it has already been said that they are part of the physical evidence whose seizure is assumed to be suppressed for this motion. That being the case, the record is insufficient to establish probable cause that the Coins were the proceeds or intended to be used for a drug transaction. Even if the United States were able to establish probable cause, Holly has raised material factual issues to support the legitimacy of their origin. She and her brother Steve testified that their father collected coins and gave them to both Holly and Steve as a gift (Holly Dep. 13–18; Steve Dep. 15–18) and that they were given to Holly in the waterproof piping in which they were found (Holly Dep. 16; Steve Dep. 19). Accordingly a reasonable jury could find the Coins not subject to forfeiture.

With respect to the Funds, again no information surrounding where and how they were found may be considered for present purposes due to the possible Fourth Amendment violation. Additionally, Greg has raised an issue of fact about the origin of the Funds—he claims that they were wages from his 10–plus years of employment with the City of Chicago (Greg Dep. 18–19, Ex. 4 ¶ 13). Thus a reasonable jury could also find that the Funds do not qualify for forfeiture under Section 881(a)(6).

In sum, the United States' motion must be denied as to both the Coins and the Funds. If the United States persists in seeking their forfeiture, the factual issues will have to be resolved in an evidentiary proceeding.

### Conclusion

Because there are no disputes of fact as to Greg's insufficient interest in the Coins or as to Holly's insufficient interest in the Funds to support their Article III standing to claim those assets, the United States is entitled to a judgment as a matter of law as to those standing issues. Accordingly, Greg's verified claim to the Coins and Holly's verified claim to the Funds are both dismissed.

Even under an assumed finding that Accardis' Fourth Amendment rights were violated so that evidence resulting from the search of the Property must be suppressed, the United States has shown that there is no dispute of fact that marijuana was being grown on the Property and that therefore the Property is, as a matter of law, subject to forfeiture. Consequently judgment is ordered to be entered in the United States' favor to that effect, and both Accardis' claims are dismissed to that extent. But material issues of fact remain regarding forfeiture of the Coins and Funds, so that the United States' motion for summary judgment is denied (1) against Holly as to the Coins and (2) against Greg as to the Funds.

Finally, a status hearing is set for May 13, 1997 at 9:00 a.m. Before that date counsel for the parties should confer as to a proposed form of judgment order to implement the forfeiture of the Property under Section 881(a)(7), and that proposed judgment order form shall be delivered to this Court's chambers for its consideration not later than May 9, 1997. At the May 13 status hearing counsel should be prepared to discuss the future course of the remaining aspects of this action.[14]

---

and it is surely not for this Court to raise and consider it sua sponte.

**14.** This case provides another graphic illustration of the outstanding contributions regularly provided by this Court's always-excellent law

clerks—in this instance Andrea Axel, Esq. Without in any way denigrating the efforts of counsel for the parties (each of whom had some things right and other things wrong in their respective memoranda), the depth of analysis in this opin-

ion owes a great deal to Ms. Axel's work. As always when this Court pays such well-deserved tributes to its clerks, it should be added—though *not* at all to detract from this tribute—that any flaws (either technical or substantive) that may be found to exist in this opinion are to be laid at the doorstep of this Court and not of Ms. Axel. This Court always conducts a painstaking word-by-word and sentence-by-sentence revision of its law clerks' drafts, and the ultimate product that bears this Court's signature is entirely its own.